Simon, who is part of our panel this morning, could not be here, however, I am certain he will be listening to the audio tape portion of your arguments. When your case is called, with those attorneys who are going to argue, please step up to the podium and introduce yourselves. Each side will have 15 minutes for argument. Appellant, you have to budget your time. Whatever amount of time you'd like for rebuttal must be taken from that 15-minute portion, so take that into account. Nicole, are you here this morning? Please call the first case. 12-2-9-75, Jacob Szafranski v. Carla Dunston. Good morning, Your Honors. I am Brian Schroeder. I am here for the plaintiff appellant, Jacob Szafranski. I would like four minutes for rebuttal, please. Mr. Schneider? Schroeder. Schroeder, excuse me. Good morning, Your Honor. Abram Moore for the appellee, Carla Dunston. Very good. Mr. Schroeder, you may proceed. Thank you, Your Honor. The consent of both parties is required at the time of the proposed use of the pre-embryos. That is a matter of constitutional significance and constitutional law, as well as Illinois public policy, as has been set forth in our briefs. According to cases, I'm going to focus on Illinois constitutional law primarily because, as we know from the Cabalas case, the right of privacy under the Illinois Constitution was specifically drafted to be broader than that same right under the federal Constitution. So whatever federal rights there are essentially automatically apply under Illinois law, and then there's more because the right of privacy under Illinois, again, was drafted as the framework set forth during the constitutional debates to be broader than the federal counterpart. We know from Supreme Court case law and precedent from this Court, the Baby Doe case, that the freedom of choice in matters of procreation and family life is a fundamental right. The Baby Doe case says that the right of privacy under the Illinois Constitution encompasses and guarantees reproductive autonomy. In the Cabalas case, that case quoted the constitutional debates about the scope of the Illinois right to privacy, which again, as I just said, was meant to be broader than the corresponding federal right, but was also drafted for the purpose of preventing the invasion of bedroom intimacies based upon technological advances. And that's exactly what IVF is here. If this case happened in 1960, it wouldn't have even happened because IVF didn't exist as a concept, and this would not have happened. Is Cabalas a dog sniff case, though? Yes, it is, Your Honor, but it talks more broadly, and the reason we cite it is because it talks about what the purpose of the privacy right under the Illinois Constitution was meant to do. It quotes the constitutional debates, and part of those debates say this right is not defined and is left open, meaning that the framers intended for the scope of that right to be formulated as exigencies presented as time unfolded. And again, there was a concern about technological advances eroding someone's right to privacy. I bring it up because if you read the other cases, the cases in this area involving specifically frozen embryos or pre-embryos, there really doesn't seem to be a lot of people suggesting in courts of review that criminal search and seizure law would be helpful to either side, whereas there's other tests which your client would prevail under, notably mutual contemporary consent, which is, I think, the argument that was made down below, at least the gist of it being that both sides have to agree at both times. One is to give up when the sperm is given up, and one is when the pre-embryos or embryos are to be implanted. And you would prevail under that, but you've chosen to go down a path of it's like a search and seizure, and they argue that it's less like buying lumber. I have a problem with that, frankly. But go ahead. Well, I do not think we did not advocate the contemporaneous mutual consent approach below. I did argue below that consent was needed both at, obviously, consents needed to create them, and there was consent at that time, but the funds we submitted below also argued consent needed to be made at the time of the actual proposed use, and I grounded that on Witten, which was discussed below, which is the Iowa case, and then I also grounded it on the privacy right of the Illinois Constitution and Illinois public policy. But I am advocating. Are there any cases that say these aren't private rights that can be subject to contract? There are no cases that say that. There certainly is no Illinois law that prohibits the use or agreements about this. Well, you're dealing then with issues that can be subject to contract, and as long as they're not violative of public policy, shouldn't they be enforceable? Yes. I have no quarrel with that basic proposition, but here we have an agreement, an informed consent that the parties both signed that says no use can be made of the embryos without the consent of both partners. That should be enforced. Does that violate public policy of any kind? No. Okay. So why shouldn't we enforce it? I think you should. I'm asking you to. Why are you bringing up the whole issue of whether or not this is a right that can be subject to a contract or a private right? Why even raise it? Because I think that this case is not simply just a traditional contract. This isn't, as the Justice just said, about buying lumber or buying a chair or a thing. This is about a potentiality for human life, and also Dr. Dunson's making the argument that that initial agreement about we can't do anything without the consent of both of you was subsequently modified. And I'm raising these other arguments to address those contentions that she has made, and under the contemporaneous mutual consent approach, all that matters is did you consent at the time of the proposed use? Because obviously these pre-embryos exist, so there's no issue about whether there was consent to their creation and they're being frozen. The issue is what do you do now when they're trying to be used and someone doesn't want them used? Our position is you need consent at the time of use because, as the Witten court said, which is mirrored in Illinois public policy, the Illinois adoption statute allows for the revocation of consent up to 72 hours after birth for the adoption of a child. Since Illinois law allows people to change their minds about whether they place a child for adoption when that child is already born and in existence, we submit that Illinois public policy should allow you to change your mind about whether you create a child and bring it into existence in the first place. And that's kind of at the heart of the contemporaneous mutual consent approach. Also, Illinois does not enforce contracts for the promise to marry. And we submit, and I think the case law recognizes, procreation is a fundamental substantive right. It is probably, if maybe certainly, the most transformational personal decision a human being will ever make. And if Illinois will not enforce a contract on a promise to marry because you can change your mind after you've promised to marry someone, Illinois also, therefore, should not enforce a contract for the use of pre-embryos if that person later changes his or her mind about whether they should be used. Now, your client did agree, as you said earlier, gave consent to go ahead and to fertilize the eggs, right? And there were eight of them, and three of those survived that procedure. Would that be right? Correct. Go ahead. But, again, consent to their creation is not the same thing as consent to their use. And because IVF as a technology has allowed for, essentially, an alternative or substitute method for sexual relations as the basis for having a child, the fact that it's a different procedure or different process, it's really different means to the same end. And since it's a different means to the same end and is only possible because of advances in science and technology, functionally, and at least for purposes of this Court's analysis, the two should be considered the same. And if a contract for sexual relations is not enforceable, as the Supreme Court has said, this contract, if you assume that the consent for their creation operates as a consent for their use forevermore, that should not be considered enforceable because it's an illegal contract for sexual relations. Whether you view it that way or if you adopt the contemporaneous mutual consent approach, the end result is the same. Consent is still needed at the time the embryos are sought to be used. That's the basic point we are making. So you need two consents. And as Witten recognized and as the Illinois public policy I've mentioned recognizes, people do change their minds, probably even more than once, about whether to have children, whether to become a parent, whether to marry or not to marry. Usually you're not allowed to change your mind once you fertilize the lady's eggs, right? I mean, under any circumstances. Once you impregnate them, you impregnate them. That's via sexual intercourse. Well, that's the key. This is via contract. From the dawn of time until about, say, 1980, give or take a decade, the only way to fertilize an egg was to engage in sexual intercourse. And, yes, then you have no, there's no changing your mind. Once you engage in the act and the sperm is inserted in a woman's body, whatever happens is going to happen and your consent is no longer an issue. But that's not what happens with IVF. IVF allows fertilization to occur outside the body and then for those eggs to be frozen and used at some future date. That has significance. And you can't, you know, just for example, like the legislature cannot do indirectly what it cannot do directly. You cannot say, well, this is not the same as sexual intercourse, when what you're doing is the same thing that sexual intercourse accomplishes. And that should have to, we submit, that needs to be taken into consideration. Are there any relevant Illinois statutes regarding how this should work? We submit there are. The Adoption Statute and the Breach of Promises Act. And I concede that they do not address what to do with cryopreserved free embryos. There is no Illinois statute that addresses that exact possibility or situation. They have the Sperm Donor Act, right? But your argument is that. The Sperm Donor Act says that if you donate sperm for use of insemination of a woman who is not your spouse, well, I'll presume you are not the natural father. That doesn't prohibit someone from contracting to be the natural father if they want to. And it does not prohibit contracts for the use of cryopreserved free embryos. And in fact, the purported co-parent agreement that the defendant alleges was executed or executed by conduct says, and I quote it on page 47 of my appellate brief, Jacob is going to be a co-parent regardless of the circumstances or change of circumstances between the parties. He's not a sperm donor. I mean, that's the agreement that Dr. Dunson says is in effect. And if her position is accepted for purpose of argument, there is no sperm donor situation here. So she's asking him to be a co-parent with all those attendant duties and obligations. Constitutionally, it's a matter of his liberty interest, his privacy rights in procreation and choosing whether to become a parent or not. It's not for this Court to force that upon him when he does not want it. At what point should he be allowed, should the male, the sperm person, supplies the sperm gametes, I guess it would be, at what point should he not be allowed to withdraw his consent? Once the pre-embryos are inserted inside the woman's body, which is essentially the consummation of the act of sexual intercourse. At that point, he has no more say in the matter. Whether he wants, whether he, and if he then, but that's the answer. When the sperm, when the pre-embryo is inserted inside the woman's body, his consent, that's when he has the right to consent, and after that he can have consent or not consent to anything. The contract is written up at Northwestern involving the clinic provided what, in terms of what should occur if they disagree? The contract, as I just quoted before, said no use of the pre-embryos can be made without the consent of both parties. So that is what it does say, and there's no dispute about that. It then goes on to say, be aware of the possibility your relationship may change, you may separate, one of you may die, you should consult an attorney and talk about what you want to do in the event your relationship changes or ends. So that's what it says. But none of that supplanted or in any way invalidated the initial statement of no use can be made without the consent of both people. And again, to answer, going back to what Justice Harris had asked, I'm bringing up these other issues because Dr. Dunson's alleging the co-parent agreement is a valid and enforceable agreement. If they had signed it. If they had signed it. No one signed it. No one signed it, and also no one performed under it, because that's another issue that Dr. Dunson brings up. No one performed under it. If you look at the agreement that was signed at Northwestern on March 25, it obviously contemplated Mr. Stefanski providing sperm to be used to fertilize her eggs, and he, in fact, did it on that date, on March 25. If you look at her complaint, I'm sorry, if you look at her counterclaim, paragraph 13 of her counterclaim, which I'll give you the record site in a moment, that says that on March 25 sperm was deposited to be used as a backup for possible use on the date that Dr. Dunson had her eggs removed from her body, harvested. Obviously, if you do something to be used as a backup for something that's going to happen in the future, there's still an expectation and an understanding that you will do something else in the future. So that's the basis for our contention or argument that there was no performance or signing by conduct of the co-parent agreement because Mr. Stefanski did nothing he was not already obligated and said he would do. And on top of the fact that the co-parent agreement was never signed. Getting back to Justice Quinn's question, if they don't agree, either on the basis of the contract that they signed, or they can't agree because there's no consensual or mutual consent at a later time, what's the status of the embryos? The embryos stay where they are in cryopreservation. So the status quo is preserved? Yes. Forever? Unless and until they agree. Okay, now the contract provides that Northwestern can shut them off after two years. Someone has to pay the bill to preserve them. Yes, and I'm not sure if this made it into the record, but once the circuit court denied our assembly judge a motion and granted Dr. Dunston's, we got a stay of the ex-enforcement judge on pending appeal, and one of the conditions of that stay is that Mr. Sofransky will pay all storage costs, which is similar to what was done in the Witten case by the Iowa Supreme Court. And I don't know if it made it. Mr. Sofransky is paying for the storage? Yes. Okay. Well, only as a person who wants them to be destroyed. How that came to pass are essentially settlement discussions that I will not get into. That's fine. But that is something that the Witten court sanctioned. But to answer your question is, yes, Northwestern is perfectly within its rights to say, look, it's been two years, we're going to do whatever the informed consensus we can do. Well, Dr. Dunston and Mr. Sofransky are just as free to go back and say, look, we want you to keep storing them, we'll pay whatever you want, and we'll work it out. And I would like to think that since these take up very little space, obviously, it's not going to be any burden whatsoever to keep them preserved and frozen for as long as the science will let. Yes. What tests did the trial court use, though? It seems like he cited the Reber case, which I guess would be called a balancing test. Would you agree that's what he did? It was just as ‑‑ I thought she did. Yes, I apologize. Judge Hall, I don't think she really applied any tests, to be quite frank with you. When she heard arguments, we both presented our arguments, and then she deliberated. She said none of your cases apply. She said my cases were not persuasive and Dr. Dunston's cases were persuasive. So it was kind of a blanket statement that really wasn't ‑‑ it gave no specificity of what the rationale was for her ruling. But I do think I can still try and answer your question, because the thrust of Dr. Dunston's argument was the Reber case from Pennsylvania, and that it was these are her last and, therefore, only and best chance of having biological children. And I think ‑‑ If that's the question, that's correct, right? I don't think there's any medical evidence in the record to support that assertion, but I'm not here to dispute it. I don't think it matters to the outcome. So if you say, prior to the judge saying that she wanted to follow Reber and not your cases, were the parties told by the court what test that you would have to measure up your depositions on, what your burdens were, and what evidence you would have to present? No. So at the end of the day, when you both presented whatever you wanted to present, the judge then said, well, I'm going to apply essentially the Reber test found in Reber, and under that, we're going to go ahead. Yes. I would say that's a fair characterization, albeit it's putting words in Judge Hall's mouth, but I think it's a fair assessment of what she did. Well, it's more, I guess, in the evidence you both presented, since when you're both seeking summary judgment and you're putting on whatever evidence you have, you don't know what standards you're supposed to meet or what elements there are. You might know the test, don't you? No, I understand. But you don't know what test Judge Hall is going to adopt when you're trying to meet whatever burden you have. I think both Mr. Moore and I will agree on this much. This is brand new in Illinois, and certainly there is no case and no statute anywhere that talks about what this situation, what tests or what you do. So we both did what we thought anyone would do. We looked to other states, and then I found I made analogies to the abortion issue because it's a manifestation of the right of privacy under liberty, which exists obviously both under federal and state constitutional law. I made an argument about public policy about the unenforceability of contracts for sexual relations. Mr. Moore cites Reber. I cite Witten. And we make our best arguments on what we think are precedent that's closely enough analogous that it should guide this Court's decision on how to proceed. I didn't mean to insult him. I'm just saying it's hard for the lawyers and the parties then to meet evidentiary standards when they have no idea what the test is yet. And I don't mean to criticize Judge Hall. I bring it up because this case is resolved in the summary judgment, and hopefully when the three of us meet, the judges will come out with a test. And when we do that, we may have to remand back for the trial court or the parties now knowing what the test is to reopen the proofs to show how they've prevailed, how they've met whatever the burden is. Because I don't know that it would be fair to either side to say, oh, here's the test at the end of the day, and you didn't meet your burden under it when nobody knew what the test was going to be, understanding the clock is ticking. Well, you've got to obviously make that determination once you make your ruling and decide the basis for your ruling. We have to stick with the facts of this case. And the facts of this case appear to me, you've got some sort of agreement that says no use can be made of these embryos without the consent of both parties. And they both signed off on that. It was never altered. It was never amended. It was never modified. And the language appears to be unambiguous. It appears to be clear and concise. Now, that language, if we were to take a contract approach to this, that language appears to me to make that contract of effect the same and identical to having a contemporary mutual consent. That language puts the status of the parties in a situation where they are in a contemporary mutual consent. Would you agree or disagree? I agree completely. And I think this case, with due respect to Justice Glenn. So it seems to me that fundamentally in this particular case we're weighing, is it going to be contractual or is it going to be some sort of crazy balancing test? Not crazy, but some sort of balancing test by the court. Well, our position is that whether you do it by saying this is a contract for sexual relations or adopting the contemporaneous mutual consent approach or saying as a matter of constitutional law you need to consent at time of use, the relevant facts are both Jacob Safranski and Carla Johnson created these pre-embryos. Carla Johnson wants to use them. Jacob Safranski does not. That's all. And therefore, with all due respect to you, Justice Glenn, and depending on how you decide, obviously you rule the way you see fit, but with those facts and under any of these models that have been put forth that I've just mentioned, there's no need to remand. There's just a need to enter judgment saying you need consent to both, you don't have it, and unless until there is such consent the embryos stay where they are. Well, under the balancing test that wouldn't be true, I'd suggest. But why don't you save some time and we'll hear from the other side. We're not in any rush. Maybe there's something else you wanted to say. Very well. Thank you. You'll have rebuttal, five minutes. Good morning, Your Honors. May it please the Court. My name is Abraham Moore, counsel for Carla Dunstan in this matter. Your Honors, you're being asked to determine whether a woman who was rendered infertile as a result of cancer treatment can realize her only opportunity to have a biological child. If this Court does not award the pre-embryos to Dr. Dunstan, it will be the first Court in the country to deny a party who created pre-embryos the opportunity to use those pre-embryos when they represent that party's last chance of having a biological child. Well, given that, then there's never going to be a real hearing on balancing, would there? You'll always have the woman winning. That's not correct, Your Honor. In fact, there are ten cases out there. In each case where they had performed the balancing test, there were three cases that performed the balancing test. In two of them, the embryos were destroyed. In one of them, where it was the woman's last chance to have a biological child, Reber, the pre-embryos were given to the woman. But in Tennessee, the Court determined that it wasn't the first case. Is there any case where this was the woman's last chance to have it, but the Court denied it? No, Your Honor. If the Court finds it against my claim, it would be the first Court to do that. So you're suggesting that Reber, that the sperm donor, let's call him that, even though he's not legally a sperm donor, objected throughout the procedure, and she still was able to implant the embryos in spite of his objections throughout the procedure? In spite of the litigation, I should say. That's correct, Your Honor. What the Reber Court did was first look to see was there a contract here that was enforceable? It found that there was not a contract, so it moved on to the balancing test. It's the same procedure that was laid out by the Davis Court in Tennessee. First look to see if there's a contract. If not, move on to the balancing. So Reber moved on to the balancing test and considered the factors. And the factors were similar to the factors we have here. Ours are more compelling than were present in Reber, as we'll discuss. So — But there was no agreement at all in Reber, correct? That's correct, Your Honor. So unlike here where we have, as Justice Harris has put it, the language in the IVF contract, which, indeed, I agree would support the idea that there has to be mutual consent to do it, in Reber there was no such agreement at all. They probably hadn't talked about it at all because it was kind of early on in the history of litigation in this area. That's true. Actually, I believe that in Reber, for some reason, the hospital was moving and the IVF was transferring. Right. But there was no agreement of any kind of what was going to happen. There's no piece of paper in Reber indicating anything about mutual consent. That's correct, Your Honor. There also was no expression of the party's intent in any other fashion. Here, it's clear what the party's intent was. We have verbal expression of intent. He said, I'm going to donate the sperm to help you have children. That's a verbal expression. We then have the written co-parent agreement under which the party's performed. And then we have repeated e-mails and statements from Mr. Szafranski telling Dr. Dunston, yes, you can use his pre-embryos. I always intended for you to be able to use his pre-embryos. The intent was for you to have children, not for us to have children together. So the intent of the party is what you really have to get at. But I'm sensitive to this. Isn't the intent of the parties best expressed by a signatronic contract? Oftentimes, that's true, Your Honor. This contract, in particular, though, the informed consent is a little bit different. And first, the co-parent agreement expressly says that it overrides the informed consent. The parties performed under the co-parent. But they never signed that. They did not sign that. So it's not an issue in this case. Well, they performed under the contract, Your Honor. But it's not even material to this case. It's not part of the case. If they signed it, I'd agree with you. Right. Well, the Illinois law will enforce a contract that's performed. If you perform under a contract, then it becomes enforceable. And here, it's clear that the parties performed not only that, but Mr. Szafranski told Carla Dunston, I will sign it. I'll sign that contract. And then the next day, he turned around and donated his sperm, performing under the contract. And later, he further performed under the contract because what this co-parent agreement says is that if Jacob's intent changes, it contemplates exactly where we are. It says if Jacob's intent changes, the parties will enter into a new legal arrangement. And under that legal arrangement, there's one critical condition, and that is if Dr. Dunston can use the pre-embryos because that was always in the forefront of their intent. So when Jacob's intent changed, what did he do? He started sending draft sperm donor agreements to my client, a new legal arrangement under which she could use the pre-embryos. He performed under the co-parent agreement in that respect. But she didn't sign those, right? She did not sign those. Right. No, but the point is it shows performance under the co-parent agreement. But I'd like to talk a little bit more about the informed consent, if I could. This is simply the hospital telling the parties its policies for how the pre-embryos will be handled. The parties did not, they didn't negotiate the contract between themselves. It was never intended to be a dispute resolution mechanism between the two of them. And, in fact, the Massachusetts Supreme Court has said exactly that. She's an intelligent lady. She's an M.D. She knows all about consents. Doctors use these consents. She knows all this. She knows that there's a presumption that they're going to be binding. And you've got an agreement that says that expressly they know nothing can be used without consent of both parties. It goes on to talk about what happens between them in the event of divorce or dissolution of the marriage. It goes on to define what happens as between them, what happens upon death. Well, Your Honor, what it says, what happens between them in the event of dissolution, is that Northwestern will abide by any terms of a court decree. That's why we're here. It contemplates that if the parties, if this relationship dissolves, the parties will petition the court. Now, that's a provision that accrues to the benefit of the hospital to insulate itself in that event. Well, Your Honor, this entire contract is to insulate the hospital. That's the purpose. It's a consent from the parties to the hospital, not a dispute resolution mechanism. And, in fact, the Massachusetts Supreme Court looked at these informed consents and said they exist to explain to the donors their benefits and risks. And here's a quote from the Massachusetts Supreme Court. These informed consents are not to act as a binding agreement between the parties should they later disagree as to the disposition of the pre-embryos. They'll have to abide by the court, right. Correct. And so there are a number of cases. So out of the ten courts in the country that have decided these issues, seven of the courts will enforce contracts and the other two will balance. And then there's, of course, Iowa, which has a contemporaneous mutual consent. But each of these courts, some of those courts did enforce informed consents, but they were all much more specific here, where the parties said it is our intent that in the event we dissolve, the embryos will be destroyed, for example. But each of them had a much more specific version than we have here. Here what we have is the hospital saying these embryos are your property and we will make no use of those embryos without your consent. But if the relationship separates, if you divorce or separate, in that event, it's up to the court. The criticism of a pure contractual test and Witten, the Iowa case, it seems to me is based upon the only, the criticism is based solely upon this article written by Carl Coleman in a law review article. Are you aware of that? The criticism of Witten, Your Honor? Of a contractual approach being used. The criticism seems to be arising from this Carl Coleman article that appeared in the Minnesota Law Review, which frankly I have difficulty understanding. But to be fair, I think there is. It's not a case. No. But it's some sort of lawyer's opinion as to his concerns on the contractual approach because these are decisions about the disposition of frozen embryos which implicate rights central to individual identity and that on matters of such fundamental personal importance. Well, isn't that true of all contracts? All contracts are personally important to everyone. Sure. We agree. So what is the concern because we're dealing with embryos?  Well, Your Honor, we think what the Court needs to do is determine what was the party's intent and follow that intent. So we suggest that that's the very first step. Was there a contract? And the Court should definitely follow that. It's our opponent who believes that these contracts somehow violate public policy, although it's not clear today. I believe he said he doesn't think they do violate public policy. But then the contract doesn't violate public policy, why shouldn't we see that it's enforced? Well, Your Honor, we believe that you should enforce the full contract between the parties, the agreement between the parties, and enforce the party's intent. This informed consent, as we said, Massachusetts courts have critiqued these. And if you look at the language of the consent, it says, look, for disputes between you two, go talk to another lawyer. And that's exactly what they did. It also says for disputes between you two and you dissolve, listen to what the Court says. So that's why we're here. It says only if applicable that Northwestern won't do anything with the embryos unless there's mutual consent. If applicable, meaning if the parties are still together or if the Court hasn't decided something to the contrary or if the parties haven't had some other expression of their intent, which we have here. So the other expressions of intent we have here starts from the very beginning, the verbal expression of intent. Well, the AMA has an ethics opinion saying just what Northwestern said in their IVF consent form. The GAMI provider should have an equal say in the use of their pre-embryos, and therefore their pre-embryos should not be available for use by either provider or changed from their frozen state of consent of both providers. So it's not just Whitman. It's not just people in Iowa. The AMA says you need both people to consent. Well, I think certainly in most situations, with no agreement to the contrary, the parties, I think, need to balance. And if the parties are together, if there's a husband and wife together, and they have pre-embryos that are stored, I think that's probably a good policy, that there should be mutual consent at the time of use. Here we have quite a different situation in that their intent was always something to the contrary. Their intent was always that Mr. Stransky was trying to help Dr. Dunson have children in the event that she ever beat cancer, which gladly she did. That was always the intent of the parties. So it was never intended that the parties would raise a child together. Mr. Stransky sent an e-mail saying, I never intended to raise a child with you. That was never contemplated by me. I always wanted to help you have your own child. So clearly the intent of the parties was exactly that. And that's what we hear. That's the contract that we're trying to enforce is the intent of the parties. And that was expressly written in the co-parent agreement. The parties met with the attorney. The attorney then wrote out exactly what they had talked about. And he supplied a deposition to their rights and that they disagreed. She, yes. The attorney they met with said that they discussed a number of different things, but it appeared the direction they were going was exactly how she wrote it out. So what she wrote was that if the parties separated, that they would come to a new arrangement under which Dr. Dunson would always have control over the pre-embryos and be able to use them. And then there's a separate provision in there that says if the parties separate, Dr. Dunson gets the pre-embryos. So that's an expression of their intent. And not only that, but as we discussed, Mr. Stransky performed under that both by donating. What was this expression of their intent you just described? The expression of their intent was in the co-parent agreement. And it said that if the parties. They never signed it. That's correct. But they did perform under that. They never executed it. But they did perform under that, Your Honor. And it was an expression of their intent. And the attorney wrote it down for the reason that that's what they expressed. Also, Mr. Stransky subsequently verbally and in writing confirmed that that was his intent. He said, yes, I want you to be able to use the pre-embryos. Yes, I always said that you should be able to use the pre-embryos. Yes, the pre-embryos, I was intended to help you become a parent using these pre-embryos. So the intent is clear that that was always what the parties wanted to do. That was the whole purpose of this arrangement. Now, if the court finds that there is no clear contract, or if the court finds that it can't determine what the intent of the parties was, then, as the other courts have done, and McBriever did, and as the Tennessee court did, of course, you move on to balancing the parties' interests. Well, actually, before that, I'm sorry, there's a promissory estoppel here as well. Clearly, the plaintiff clearly promised that he was donating his sperm, promising that he would help her become a parent if she was ever able to when she beat cancer. She relied on that. All eight of her eggs that were retrieved were fertilized with his sperm. She relied on it to her detriment. She has no more eggs that she could use today to try to become a mother. So the court should prohibit Mr. Sofransky from backing out of that promise after it's been so detrimentally relied on. Mr. Sofransky argues only one thing in response to that. He said reliance wasn't reasonable. Why? Why wasn't reliance reasonable? He says because you knew in the co-parent agreement it said that these agreements may not be enforceable. Well, she didn't rely on a promise that the agreement would be enforceable. She relied on his promise to help her have children. That's the promise that he relied on, that she relied on, and expressed it to her detriment. So he should not be permitted to back out of that. Assuming the court does not enforce the contract or stop Mr. Sofransky from taking this position to prevent my client from ever becoming a mother, we move on to the balancing test. Under the balancing test, the court balances the party's interests and determines whose interests will be most affected by an award of the pre-embryos. This approach is followed in Pennsylvania, Tennessee, and New Jersey. So how will Dr. Dunstan be affected if she's not awarded these embryos? Well, most critically, if the court does not award the pre-embryos, she will never be a biological parent. It's a dream that she's had her whole life, the most important thing to her. She specifically planned for this eventuality, and the court would take that away from her by awarding the embryos to someone else. That alone is determinative, and this court should not be the first court in the country to take embryos from someone when it's their last chance to become a biological parent. Well, don't misunderstand anything I may have said. This court, I'm very sensitive to her wishes and her emotions in this matter, but it would seem to me that when two parties go into a medical situation for this donation, that they would very seriously consider signing a document which says, no use can be made of these embryos without the consent of both partners. And if that was not their intent, if that was not their agreement, then they would not have signed it. Well, Your Honor, what's important is that the same day that they signed that, they were sent to another attorney to determine how they would resolve the disputes between themselves. That was always within the contemplation of the parties. That would be determined separately. In fact, the informed consent says, you should do that. You should go see another attorney to figure out how you're going to resolve the disputes between yourselves, and then we'll abide by whatever agreement you come up with or whatever the court says. It only says that sort of the default rule is that the hospital won't do anything unless the parties either consent, or if they separate, the court gives them an order telling them what to do. Now as Justice Harris points out, this is a medical procedure, right? Yes. Can you point to another medical procedure where hospitals and courts should enforce patients to go through them in the absence of the patient's consent? If this were an organ donor and if somebody were to say, listen, I'll give up one of my kidneys to help my sister because otherwise she's an extra and she's going to die, and everybody's very happy about it, and they go down there and they prepare the both of them and they take them down to the operating room, and the guy says, I changed my mind. I don't want to give my sister my kidney. And the sister says, but I'll die. Yeah, you will. I'm sorry about that. Is anybody on earth going to tie the guy down to a gurney and remove his kidney and give it to the sister? No. Or they'll say, no, you don't have to give it, and she'll die. No. I don't believe any court on earth would force him to have his kidney extracted. And I think that the reason is you have personal autonomy and bodily integrity, and the court is not going to interfere with your physical body. It's the same reason that the courts won't enforce contracts of sex. I mean, plaintiffs try to tie that in here, but that's the same reason. It's the same reason. You have a bodily integrity, and the court's not going to enforce anybody to intrude in it with a scalpel or sexually or any other way. Here it's quite a different situation. We're not attempting to extract any biological material from Mr. Szafranski. We're not even attempting to use his sperm. His sperm no longer exists. We're attempting to use a separate body of cells that's out there. So that's what we're trying to do here. So it's quite different from that type of situation. But in terms of the – obviously the tug you have for Dr. Dunstan is that she'll never conceive again. And she did do this clearly on reliance on Mr. Szafranski, who gave his word. And as you say, at least partially, you'd say completely, cooperated and performed. And that is a disaster for Dr. Dunstan. But in the case I bring up, it leads to a death of the other person. And it's almost always the family members. That's how organ transplants work. We don't intervene. Nobody even suggests we intervene. What you do is you plead to the person who agreed to do it to not back out, be an honorable human being. And I'm sure it's already been done in this case, and it hasn't worked. Those pleas have been extensive, and they've not been worthwhile. But as I said, the reason why he wouldn't enforce that contract, assuming that the kidney had already been withdrawn, assuming that they had already removed the kidney in a separate – in a freezer somewhere, then the situation may be different, Your Honor. I don't know. I think that intellectually it certainly is different. You're not, of course, not enforcing invasion into a body. That's why we have oral arguments. So we know how Dr. Dunstan will be affected here. But one other thing I'd like to point out is she's trying to achieve parenthood in all of its capacities. She wants to be the legal parent to this child. She wants to be the gestational parent. These are sort of a bundle of sticks of parenthood. Legal, gestational, genetic. That's her interest here. Mr. Szafranski is trying to avoid not legal parenthood. We're not trying to force legal parenthood on him. Gestational, of course, is impossible. It's only this pure genetic. But there's something to that, right?  Yeah, I don't think males are all that important, frankly, in this area, other than they have to supply something. But other than that, no, the courts have universally said no. Males have a right not to have a child wandering around the earth, even though they have no legal responsibility. They should have a moral responsibility. They should internally feel that. And so something should go amiss with Dunstan's child. Mr. Szafranski will be affected in some way by that. And, therefore, he has a right to say, no, I don't want a child of mine on this earth without my permission. I concede he will be affected in that sort of way, this sort of ethereal way. But the truth is that he's not going to be affected in any of the other ways of parenthood. We've stripped it down to the very least. And I don't know if that's true, right? At the end of the day, if – and I understand what Judge Hall did and what Dr. Dunstan says. But at the same time, we've got cases in our division where mothers agree to something in a child, even after they're a majority. They sue at 22 to make Dad be held liable. And I think, frankly, that is probably their right. I don't want to prejudge any cases. I think that in some – you're correct in some ways. If he should fail to support the child, doesn't the state have the right to go against him as the parent? No. The Illinois has a statute here, the Illinois Parent-to-Child. And that basically says that if you're declared a sperm donor, then you're not a father for any purpose. And he will not be legally – and I don't think he's arguing that he would be legally obligated if he was declared a sperm donor to perform any other obligation. So he wouldn't be obligated financially, emotionally. He wouldn't be obligated in any way. So back to how Mr. Sofransky will be affected. Critically, if the court doesn't permit him to destroy embryos, he can still become a father. It doesn't affect his ability to become a parent as it does my client, which strips that entire right from her. He doesn't have any existential obligation to fatherhood generally. He's agreed many times that if these embryos are not used, then they can be given to another party. Another couple can attempt to use them. They don't have the genetic material out there in the world. He'll be a genetic father. So that's not an objection that he's had. He also has repeatedly agreed that she could use these embryos. His concern wasn't some religious or ethical or moral objection. It was an anonymity. He just didn't want anybody to know. That was his primary concern throughout the entire process as evidenced in the record. But then Dr. Dunstan refused to sign it. You know, when he says, all I want is that the child not know it's me. Well, no, I'm going to tell the child. Well, and that's one of the reasons, theoretically, that we're here. Actually, frankly, Your Honor. That was the deal breaker? No, that's not the case. What happened was Mr. Sofransky demanded the type of anonymity that could never be provided, so he requested that Northwestern destroy all of its records, that the pre-embryos be donated to him. That's not in the briefs, but okay. Okay. And that's what happened. We asked Northwestern, can you do this? They said, no, we can't do that. That's why the agreement wasn't signed. Sorry about that. That's not in the briefs, but okay. I buy it. So Mr. Sofransky has also repeatedly agreed. We're not asking him to be forced to do anything that he hasn't repeatedly, repeatedly agreed to. He just says he's changed his mind. So in any event, there's no reported case, none, in which the results of this weighing test, the procreative test weighs so heavily in favor of the party who seeks to use the pre-embryos to have a child. The closest is a Reber case from Pennsylvania in which was similar to this. The wife had cancer, had preserved pre-embryos to attempt to use them. It was her last chance. The husband objected. He said that it's against public policy to force him to become a parent. Pennsylvania said public policy is silent. Illinois is the same. The court ultimately found that because it was the woman's last chance to use these pre-embryos, it was her last chance to have biological children, she could use the pre-embryos. The court also noted, and it's something that's been raised a little bit here, that the husband implicitly agreed to procreate with the wife when he agreed to undergo IVF, signed the consent, provided sperm, and agreed to fertilization. We have the same thing here. He's implicitly consented. If there's no express agreement, he's implicitly agreed by doing this entire process. So thus, under this procreator's rights test, Dr. Dunstan's interests outweigh Mr. Sofranski's. So in sum, we ask the court to affirm summary judgment in favor of Carla, declare Mr. Sofranski a sperm donor, and grant Dr. Dunstan full control of the pre-embryos. This result is not only supported by the prevailing law in this area, it's the most equitable result, permitting my client to finally attempt to realize her dream of having biological children. Unless the court has any further questions. Thank you. Thank you, Mr. Moore. Thank you, Your Honors. You have about five minutes. Very well. On page 40 of my brief, I quote, supporting record page 31, the co-parent agreement, quote, Jacob specifically represents that he does not intend to be a sperm donor for purposes of this arrangement and agrees to undertake all legal, custodial, and other obligations to the child regardless of any change of circumstances between the parties, unquote. That's the co-parent agreement that Dr. Dunstan is alleging is binding and effective. What she's saying now is totally contrary to that. He is going to be a sperm. He is not going to be a sperm donor. And I would dare say that if something were to happen to Dr. Dunstan, loses her job or dies or something, the state of Illinois is not going to care that he signed the contract saying, you know, I want to make him a sperm donor. Their state's going to come after him for support. And it's all, in a sense, irrelevant because what matters is whether you view it under contemporaneous consent. What matters is he never signed it. That's what I've been saying all along. He never signed it. This is a fiction. You could bring five drafts from a law office and say, you know, we drafted this five times. I agree, Your Honor. All the two and fours between Mr. Sofranski personally and his then-attorney are all irrelevant because they're simply settlement discussions. They're also all irrelevant because they all took place after April 6th, which is the day the eggs were all fertilized. None of it matters. He did give his word. He gave his word, but. And he gave his sperm. Yes, he did. And she acted on that, right? But even as Dr. Dunstan admits. Did she act on that? She acted on his statement that you can use them, yes, but. And she cannot use, again, I understand you disagree that there's perhaps out there some medical evidence that miraculously she can conceive and have whatever it would be. Why does an estoppel apply? On supporting record page 258, Dr. Dunstan testified that she did not fertilize, the initial plan was to fertilize only half the eggs. And the reason for that was, quote, I wanted to. Three worked, so. Pardon me? Three worked. Yes, but initially the informed consent that was signed in Northwestern, there's some handwriting on the right margin of one of the pages where there's some writing and the thrust of that was they were going to fertilize half and freeze half of the unfertilized eggs. The purpose for that, though, was in Dr. Dunstan's words, quote, I wanted to save some eggs in case I didn't want to use the embryos, unquote. That's supporting record 258. Later on that same page, she admits, when I was questioning her in her deposition, that she did that because of the possibility she would not want to use Dr., I'm sorry, Mr. Szafranski as the sperm donor. So since she was aware of the possibility she might change her own mind about using Mr. Szafranski as a sperm donor, she had to realize he might change his. So if she wants to rely on his saying on a date certain, on March 25, which is the day after she was first presented with the concept of IVF, a day later he's saying I'll donate sperm. A week later, on April 6, they fertilize eggs. If she reasonably thinks or if you think it's reasonable for her to think, he might change his mind because I might have changed my mind. And in a seven-day period, you're going to make a decision that impacts your life in the most personal and fundamental way that there could possibly be. But he's bound by that for all of time. If that's your decision, then that's your decision. But we submit that is not a reasonable position to take, especially again since she knew she might change her mind. It goes both ways. Mr. Szafranski, his deposition on page 150 of the supporting record, there was, quote, there was not an agreement reached on March 25, unquote. Again, page 153, quote, I did not agree to the co-parent agreement, nor did I sign it, unquote. He didn't even perform under it because when he deposits sperm on March 25, it was with the obvious expectation he'd do it again when her eggs were harvested. Respectfully to Dr. Dunson, she is just bootstrapping and begging the question. The informed consent says you need both consents. And nothing happened after that to change that contractual agreement and understanding. And even if it did, say he agreed on March 25 or March 29 when the co-parent agreement was drafted and emailed to Dr. Dunson or agreed to it on April 6, he does not agree now. And that's the controlling factor. I'm sympathetic to Dr. Dunson's position, too. I think all of us are. None of us are taking this lightly or suggesting that her position is trivial. But Mr. Szafranski has a right not to be a parent if he chooses not to be. He may change his mind tomorrow. He may change his mind in a week. He may never change his mind. But it's not for this court or any court to say to somebody, we're forcing you to be a parent. And that's what this comes down to. He doesn't want to be one. And there are alternatives for Dr. Dunson. She can adopt if she wants to. It's not as if this is true at the end of the line. That's completely different. I can see that. But I'm saying there are other things that can be done. Would she be a biological mother? No. But the idea that Mr. Szafranski, again, and I've said this in our papers, who is it for this court or any court to say her desire to be a biological mother is somehow superior to his desire not to be? We decide divorce cases and child custody cases on a daily basis. That's different. That's every court. Thousands of them every year. Respectfully, that's different. You're talking what to do with children already in existence and where would their interest best be served, whether with the mother or the father or someone else. This case is about bringing a child, a human being, into existence. And I dare say that the Supreme Court of the United States, this court, the only Supreme Court, and any person, pretty much anyone on the planet, would agree that that is qualitatively different than any other issue that would be presented to a court or even to a person. Again, the two most important decisions you will ever make in your lifetime are who do you marry and do you want to become a parent. And that separates this from any divorce case, a traditional contract case for a piece of lumber, a chair, selling a car, selling a painting. This is different. And that's really what this case comes down to. I understand that in any contract case someone wins, someone loses. But this is different. This is talking about creating human life. That makes this different from anything else. And that's why we think that consent needs to be at the time of the use of the embryos, not just when they're created. Because, again, in a seven-day compressed time frame of this case, spread out over your life and with the enormous consequences of being a parent, even if you never see this child, just the idea of knowing there is one, your DNA is walking around. You know, if my kidney is removed and I don't want someone else to get it, that kidney is not going to talk or walk or develop into anything. I have the right to control what happens with anything, any part of my body. And the fact that it might be outside my body doesn't change the fact that I get to control what happens to it, especially because the only reason these embryos exist is because of technology. Again, if this was 1960, we wouldn't be here. So we think that whether it's under any model we propose, but, you know, however you get to the end that we advocate, the end we advocate is Mr. needed at the time the pre-embryos were used. And absent that consent, which is an undisputed fact, these embryos have to stay where they are. We would ask that you reverse the Circuit Court's granting of Dr. Dunson's motion and enter judgment for Mr. Zafransky. Thank you. It would have been nice if adult people had acted more prudently at the inception of this whole event. The matter is taken under advisement. Thank you very much for your excellent briefs and your excellent argument. We stand adjourned.